United States District Court
Middle District of Florida
Jacksonville Division

**DEBBIE LYNN ASBURY,**

> *Plaintiff,*

V.                                                  **NO. 3:17-CV-873-J-32PDB**

**COMMISSIONER OF SOCIAL SECURITY,**

> *Defendant.*

---

## Report & Recommendation

This is a case under 42 U.S.C. § 405(g) to review a final decision of the Commissioner of Social Security denying Debbie Lynn Asbury's[1] claim for disability-insurance benefits.[2] Asbury seeks reversal and remand based on the Administrative Law Judge's ("ALJ's") treatment of opinions of two doctors, treatment of her reflex sympathetic dystrophy syndrome, findings that several of her impairments are non-severe, and findings concerning her credibility. Doc. 18. Asbury requests oral argument. Doc. 18 at 1.

---

[1] The first name in the application is "Debra." Tr. 243. Asbury sometimes uses "Debbie" in her signature. *See, e.g.*, Tr. 287.

[2] The Social Security Administration ("SSA") uses an administrative review process a claimant ordinarily must follow to receive benefits or judicial review of a denial of benefits. *Bowen v. City of New York*, 476 U.S. 467, 471−72 (1986). A state agency acting under the Commissioner's authority makes an initial determination. 20 C.F.R. §§ 404.900−404.906. If dissatisfied with the initial determination, the claimant may ask for reconsideration. 20 C.F.R. §§ 404.907−404.918. If dissatisfied with the reconsideration determination, the claimant may ask for a hearing before an Administrative Law Judge ("ALJ"). 20 C.F.R. §§ 404.929−404.943. If dissatisfied with the ALJ's decision, the claimant may ask for review by the Appeals Council. 20 C.F.R. §§ 404.967−404.982. If the Appeals Council denies review, the claimant may file an action in federal district court. 20 C.F.R. § 404.981.

## I.    Background

Asbury was born in 1966. Tr. 243. She finished a year of college and a law-enforcement certification program. Tr. 275. She has worked as a corrections officer for the Florida Department of Corrections, a deputy for the Alachua County Sheriff's Office, a marketing staffer, and a caregiver. Tr. 68–69, 275. She last worked in June 2012. Tr. 274. She alleges she became disabled on September 1, 2012, from cancer, degenerative back disease, previous ovarian cancer and complications, "no usage of the bladder, catheterization 100%," medication contributing to staying bedridden, and depression. Tr. 270, 274. She proceeded through the administrative process, failing at each level. Tr. 1, 10, 104, 115. This case followed. Doc. 1. The period under consideration is September 1, 2012 (the alleged onset date), to June 30, 2014 (the date last insured). Tr. 257, 270. The decision under review is the ALJ's decision dated July 20, 2016. Tr. 10–26.

## II.    Evidence[3]

In June 2012, Asbury saw Clark Gaddy, M.D., F.A.C.S., at least twice for abdominal pain, urinary retention, and self-catheterization. Tr. 460, 587. He first saw her when she was admitted to the hospital for abdominal pain. Tr. 587. Under "Impressions," in a report, he wrote, "[N]eurotoxic event related to the [history of] chemotherapy and likely a peripheral neuropathy. [H]er feet have slight tingling and neuropathy type problems, but this is quite minor compared to the bladder[.] [M]y current working impression is neurotoxic drugs with chemotherapy and bladder neuropathy." Tr. 588. At a later visit, he conducted a flexible diagnostic cystoscopy and reported a normal cystoscopy exam, minor cystitis, no tumor or foreign body in the bladder, and normal bladder mucosa. Tr. 460. He prescribed hydrocodone and

---

[3]Some but not all medical records are summarized here. Additional summaries are in the ALJ's opinion, Tr. 15–23, and the parties' briefs, Docs. 18, 22. This report and recommendation focuses on records from the period under consideration (September 1, 2012, to June 30, 2014).

opined her problems were "more likely" caused by Xanax or Paxil (which she reported taking for depression and anxiety) and that she "may have a chance to resolve this" by decreasing reliance on the antidepressants. Tr. 461–62. He noted that a CT scan and MRI of the lumbar spine were normal. Tr. 490. She reported having bladder cancer, but he found no evidence of bladder cancer. Tr. 461. He commented, "She seems to be extraordinarily worried about cancer but there is absolutely no sign of ovarian cancer or bladder cancer that we can identify." Tr. 632.

In September 2012, Asbury twice visited North Florida Regional Medical Center because of blood in her urine, Tr. 554, or lower extremity pain, Tr. 565. She had a "mild" limping gait and both times was discharged in good or stable condition and instructed to apply ice to her foot for leg pain. Tr. 559, 566–67.

In October 2012, Asbury had her first of many visits with Southeastern Neurosurgery. Tr. 372. She weighed 166 pounds and complained of bilateral lower extremity pain and bladder dysfunction. Tr. 373–74. A neurological exam found no impaired nerves. Tr. 374. An MRI of her lumbar spine was recommended to "better evaluate the thecal sac and nerve root anatomy to look for sources of this problem." Tr. 374. Under "review of systems" and next to "psychological," a physician's assistant wrote, "anxiety and depression." Tr. 373. Asbury's range of motion was normal in her cervical and thoracic spine, but palpitation of her lumber spine "revealed abnormalities." Tr. 374.

In November 2012, Asbury saw Dr. Steven Bailey, M.D., at Southeastern Neurosurgery for a follow-up. She reported a "general[] malaise," lower extremity pain, and losing weight. Tr. 369. He noted she had decreased range of motion in the lumbar spine, 5 out of 5 strength in all groups, a blunted affect, and moved slowly. Tr. 370. An MRI of her lumbar spine showed "mild to moderate degenerative disc narrowing without disc protrusion or herniation. There is minimal L4-5 bilateral facet arthropathy. No significant central canal or foraminal stenosis[.] Alignment, vertebral body contour and marrow signal are normal. No neural impingement[.] No

intradural lesions." Tr. 368. He reported he had reviewed the MRI with another doctor and noted the MRI showed no significant neural compression or "marrow signal change." Tr. 370. Under "Assessment," he wrote, "Her MRI scan does not show an obvious lesion to explain her symptoms. It also does not show obvious metastasis. I'm going to give her additional pain medication for symptomatic control and get her referred to oncology[.] Unfortunately, I really don't have much to offer her." Tr. 370. Under "Plan," he wrote lumbar herniated disc without myelopathy and urinary retention. Tr. 370.

The same month, Dr. Bailey referred Asbury to Lucio Gordan, M.D., of Florida Cancer Specialists, because of reported weight loss and onset of leg pain with her history of ovarian cancer. Tr. 421, 449. Asbury also reported to North Florida Regional Medical Center with complaints that included headaches, dehydration, and weight loss. Tr. 536. Laboratory results, CT scans, x-rays, vital signs and a physical exam were normal. Tr. 537. North Florida hydrated her, reported significant improvement, and discharged her. Tr. 537.

Asbury saw Dr. Bailey in January 2013 and reported having "over done it" during the holidays and having stayed in bed taking Dilaudid [hydromorphone] frequently. Tr. 366. She weighed 154.2 pounds. Tr. 366. He recommended she go to the emergency room for an evaluation and suggested she might need intravenous fluids. Tr. 366. The next day, she went to Shands Starke Critical Access and saw George Restea, M.D., and other personnel for nausea and vomiting. Tr. 380. He noted she reported regularly seeing an oncologist, but the oncologist was unavailable. Tr. 380. She reported losing more than 30 pounds in 2 months. Tr. 384. Inflammatory tests and a gallbladder ultrasound were negative, and after an endoscopy, Dr. Restea diagnosed hiatal hernia, gastritis, and copious biliary reflux. Tr. 382, 386. She was transferred to North Florida Regional Medical Center for further workup. Tr. 382. There, she reported losing 40 pounds over the last 3 months, though the report noted "her documented weight is only 10 pounds different since November." Tr. 431. A

4

North Florida report concluded, "From a hematologic/oncologic standpoint, [Asbury] has no identifiable cause of her complaints," noted she had reported suffering from chronic constipation her entire life and that could be related to irritable bowel syndrome, and questioned whether depression could be an underlying cause of weight loss. Tr. 435. A discharge summary shows a gastric emptying study was negative and she was hydrated through intravenous fluids, could eat better, responded to Miralax and Dulcolax for constipation, and was ready to be discharged. Tr. 428.

In March 2013, Asbury visited Shands Starke Critical Access with complaints of leg pain and nausea. Tr. 388. The report noted she "presents with a history of running out of pain medications, morphine, and pain," and was "negative" for depression and anxiety. Tr. 388. She was discharged in stable condition and prescribed Zofran for nausea. Tr. 387. The same month, she visited Dr. Bailey for the last time. Tr. 365. She reported feeling nauseous and unable to eat and stated she had gone to the emergency room and was given fluids, which helped. Tr. 365. She weighed 146 pounds. Tr. 365. In a report, Dr. Bailey wrote, "I do believe we need electrodiagnostic studies of bilateral lower extremities to evaluate for any peripheral neuropathy perhaps related to her chemotherapy vs any obstructive lesions. … She will start massage therapy and acupuncture to work on her nausea." Tr. 365.

Later that month, Asbury had an initial evaluation with Robert Guskiewicz, M.D., of Southeastern Interventional Pain Management. Tr. 417. She reported a burning and throbbing pain, low back pain, leg tingling, and a burning sensation in the right leg or left foot, with no leg weakness. Tr. 417. A lumbar and lumbosacral spine exam showed an abnormal appearance with some tenderness on palpation and pain elicited by extension or rotation. Tr. 419. A neurological exam was normal, with normal motor strength except for reduced strength on extension of the left hip. Tr. 419. Her affect and psychiatric findings were normal. Tr. 419. He assessed ovarian cancer, chronic pain possibly related to chemotherapy, and left ankle pain possibly related to chemotherapy. Tr. 419. He prescribed hydromorphone and gabapentin. Tr.

420. Follow-up appointments in April and June 2013 resulted in similar findings, with added notes that chronic pain syndrome was a "risk," Tr. 609, and that they had discussed injection therapy, Tr. 606–09, 620–22.

The same month, Asbury visited Dr. Gordan. Tr. 423. He reported she was alert and oriented, had a 5/5 motor exam, had an intact gait, and had normal coordination with normal cerebellar maneuvers. Tr. 423. She weighed 148 pounds and denied abdominal pain or bloating, pelvic pain, or depression. Tr. 421, 423. In a letter from Dr. Gordan to Drs. Bailey, Gaddy, and Fearing, Dr. Gordon noted Asbury had reported being "frustrated with her current physical condition but is not depressed"; her recent imaging and laboratory workup "showed no evidence of recurrence of ovarian cancer or any other malignancy"; and she had cancelled many appointments due to feeling unwell. Tr. 423–24. He concluded, "It is uncertain why she continues to have symptoms of debilitating fatigue and persistent nausea … we have suggested further laboratory workup, but the patient had to leave the office visit abruptly due to not feeling well and feeling nauseous." Tr. 424.

In April 2013, at Dr. Guskiewicz's request, Bernie Marrero, Ph.D., evaluated Asbury for an assessment of "emotional adjustment to chronic pain, chronic opioid care, diagnostic impression and treatment recommendations." Tr. 611. He recommended she receive opioids for pain management and "is a low risk for violating the Narcotic Agreement"; be considered for a trial of antidepressant medication to "stabilize physiological symptoms … and anxious-dysphoric mood"; and would benefit from individual psychotherapy on coping with chronic pain and psychosocial stressors Tr. 612–13. Under "Diagnostic Impression," he wrote "Pain Disorder associated with psychological factors and general medical condition." Tr. 613.

In May 2013, Asbury visited the North Florida Regional Medical Center. Tr. 514. An "emergency provider report" indicates she reported bilateral lower leg pain and that she had run out of medication the day before. Tr. 514. She denied nausea, constipation, and frequency or urgency in urinating. Tr. 516. The provider assessed

"neuropathy," gave her hydrocodone, prescribed Dilaudid and Zofran, and instructed her to follow up with a pain specialist in the next three days. Tr. 520.

In June 2013, Asbury saw William Beaty, Ph.D., Licensed Psychologist, for an evaluation. Tr. 615. He observed she walked with a slow, tentative gait. Tr. 615. She explained she had retired when she was diagnosed with ovarian cancer and later worked as an unpaid caregiver before stopping because she had to wear a catheter bag. Tr. 615. She reported losing 55 pounds since 2012. Tr. 616. He described her mood as "depressed and anxious" and affect as "sad, constricted, and flat." Tr. 616. She was oriented to person, place, time, and date, and knew the reason for coming to the evaluation. Tr. 616. Her speech was normal, her thought process was intact and organized, and she exhibited no delusions or paranoia. Tr. 617. On attention impairment and cognition, she could count backwards fast and accurately, recite the alphabet fast and accurately, complete mental math fast and accurately, and respond verbally with excellent insight and abstractive ability. Tr. 617. On memory impairment, she could recall digits forward and backward and recall three of three words after five minutes. Tr. 617. Dr. Beaty reported she was "pleasant, interactive, cooperative, responsive to questions and spontaneously elaborated answers," and had good eye contact. Tr. 617. He noted she was "low key and seemed fatigued by end of interview." Tr. 617. On Axis I, he diagnosed major depressive disorder, single episode, severe without psychotic features; posttraumatic stress disorder, chronic; and sexual abuse as a child. Tr. 617. He assigned a Global Assessment of Functioning ("GAF") rating of 40 and opined her prognosis was "poor."[4] Tr. 617. He opined she can manage

---

[4]The former version of American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (4th ed. 2000), includes the GAF scale used by mental-health practitioners to report "the clinician's judgment of the individual's overall level of functioning" and "may be particularly useful in tracking the clinical progress of individuals in global terms, using a single measure." Manual at 32−34. The GAF scale is divided into 10 ranges of functioning, each with a 10-point range in the GAF scale. *Id.* A GAF rating of 21 to 30 indicates behavior considerably influenced by delusions or hallucinations, or serious impairment in communication or judgment, or inability to function in almost all areas. Manual at 34. A GAF rating of 31 to 40 indicates some impairment in reality testing or communication or major impairment in several areas,

her own funds. Tr. 617. On her ability to do work-related tasks, he recorded her statements only and did not state his own opinion.[5] Tr. 617–18.

During an August 2013 visit with Dr. Guskiewicz, he reported Asbury's cervical, thoracic, and lumbar and lumbosacral spine showed no abnormalities. Tr. 686. A neurological exam was normal, and he noted "no anxiety, no high irritability, no depression, and no sleep disturbances." Tr. 686. Visits through November 2013 reflect the same or similar findings.[6] *See* Tr. 672, 676, 681, 686.

In September 2013, state agency doctors Todd Giardana, Ph.D., and Minal Krishnamurthy, M.D., evaluated Asbury's application and medical records. Tr. 110–14. Dr. Giardana reported, "[Asbury] is not presently involved in specialized mental health [treatment] or taking any psychotropic medication. At the recent [consultative exam with Dr. Beaty], the objective exam revealed no obvious indications of a severe mood/behavioral     disturbance,     acute/residual     psychosis,     or     significant

---

such as work or school, family relations, judgment, thinking, or mood. *Id*. A GAF rating of 41 to 50 indicates serious symptoms or any serious impairment in social, occupational or school functioning. *Id*. A GAF rating of 51 to 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id*. A GAF rating of 61 to 70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well. *Id*. The latest edition of the Manual abandoned the GAF scale because of "its conceptual lack of clarity … and questionable psychometrics in routine practice." Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed. 2013).

[5]Dr. Beaty wrote: "sitting – 'have to prop legs up, hour a[t] most, then have to lay down, severe leg pain'; standing – '10 minutes at most on a good day'; walking – '10 minutes, very slowly'; lifting/carrying – 'zero, I'm weak and would get severe leg pains'; hearing, speaking, vision 'ok'; traveling – 'have handicapped sticker so can park near dr. office for appointment, can only go out for one appointment a day because I throw up later, and I can only be out for an hour or so'; understanding – 'ok'; memory – 'poor for phone numbers, names, misplacing things around the house or in my room; I'm good at recalling directions and instructions'; sustained concentration – 'get lost in thought, have to re-read sections of magazine or book'; task persistence – 'leave things half done due to pain or loss of interest'; social interaction – 'keep to myself, my condition is embarrassing, people don't want to be around me.'" Tr. 617–18.

[6]In a December 2013 visit, under "Plan," Dr. Guskiewicz reported, in part, "Anxiety" and prescribed Xanax. Tr. 668.

neuropsychological impairment—making the assigned GAF score of 40 highly suspect." Tr. 111. He opined the evidence established a mental medically determinable impairment that is not severe because she had only modest limitations in daily functioning and the ability to perform basic mental work activities during the workday. Tr. 111.

Dr. Krishnamurthy provided opinions on Asbury's physical limitations. Tr. 112–14. She opined Asbury could occasionally lift or carry 20 pounds; frequently lift or carry 10 pounds; stand or walk with normal breaks for a total of 4 hours; sit with normal breaks for more than 6 hours in an 8-hour workday; and push or pull an unlimited amount. Tr. 112–13. To explain the limitations and evidence supporting the opinions, Dr. Krishnamurthy wrote, "1 spine mri: there is multi level mild to moderate deg disc narrowing w/o disc protrusion or herniation. [T]here is min. 14-5 bil facet arthropathy. [N]o sig. central canal or foraminal stenosis present at any level alignment vertebral body contour and marrow sig are normal no neural impingement at any level." Tr. 113. She opined Asbury could occasionally climb ramps or stairs; never climb ladders, ropes, or scaffolds; and frequently balance, stoop, kneel, crouch, and crawl. Tr. 113. She opined Asbury has no manipulative, visual, communicative, or environmental limitations. Tr. 113. Dr. Krishnamurthy concluded, "The[r]e was a question about recurrence of ovarian cancer causing back and [lower leg extremity] pain. [Asbury] had a PET/CT scan on 12/05/2012 which showed no hypermetabolic activity. 1/3/2013 pelvic US neg. Her symptoms are partially credible, but exams are [within normal limits]. She should be capable of the activities in this [residual functional capacity] which is reduced for pain." Tr. 113.

During a February 2014 visit with Dr. Guskiewicz, Asbury reported increased anxiety "related to season, sister death, husband's illness (went to ER) and son now deployed to Afghanistan." Tr. 654. She reported no longer taking gabapentin because it did not alleviate pain. Tr. 654. Under "Diagnoses" for "Past Medical/Surgical History," Dr. Gaskiwicz noted irritable bowel syndrome, headache syndromes,

9

depression, anxiety disorder, and ovarian cancer treated with hysterectomy and chemotherapy. Tr. 655. He prescribed alprazolam for psychogenic pain disorder. Tr. 652. Records of visits from March through May 2014 show similar findings. *See* Tr. 641–44, 646–47, 650–52.

In June 2014, Dr. Guskiewicz reported that Asbury had filled prescriptions from Dr. Restea for a large quantity of OxyContin and oxycodone while he had been prescribing hydromorphone. Tr. 640. He found that violated the narcotic contract and discharged her from the clinic.[7] Tr. 636.

In November 2014, Asbury went to Shands Starke Critical Access with complaints of headache and nausea. Tr. 773. The report noted she was "negative for [back] pain with movement" and "able to walk with[]out any difficulty." Tr. 775. Two days later, she returned to see Dr. Restea for headaches. Tr. 748. She reported she had been diagnosed with bladder cancer in March 2014. Tr. 748. He noted that a neurology workup, lumbar puncture, EEG, and brain MRI were "all unremarkable." Tr. 748. She also saw a neurologist, who opined that, for the headaches "the approach would be conservative and would simply target the chronic daily headache condition with appropriate prophylactic therapy." Tr. 753.

Later that month, Asbury went to North Florida Regional Medical Center for similar problems, where "[g]astroenterology suggested [weaning] opiates as they are likely contributing to her nausea and vomiting. The patient declined opiate weaning." Tr. 815. Progress notes from North Florida indicate she had intractable headache, intractable nausea vomiting, and "chronic back pain, opiate dependent on high dose

---

[7]Shortly after the last visit with Dr. Guskiewicz, records (not discussed in the ALJ's opinion or either party's brief) show Asbury received counseling from a licensed clinical social worker. The first visit was after the date last insured, in August 2014, and the notes reflect visits only through September 2014. Tr. 797–803. Asbury does not reference this evidence in her brief.

methadone"; "it is likely to me that she has narcotic bowel and she should probably be weaned. She's not very receptive to this line of thought." Tr. 893–94. She followed up with Dr. Bailey, who noted her motor strength was 5/5 and gait was within normal limits. Tr. 808. He reported she "show[ed] a good response to Diamox," although it caused side effects like nausea. Tr. 806.

In December 2015, Asbury weighed 137 pounds. Tr. 781.

In January 2016, Dr. Beaty completed a "Mental Residual Functional Capacity Assessment" based on his June 2013 examination. Tr. 791–93. He stated the limitations were "as of 6/20/13." Tr. 791. He opined Asbury has mild limitations in abilities to remember locations and work-like procedures and to understand and remember very short and simple instructions.[8] Tr. 791. He opined she has moderate limitations in the ability to understand and remember detailed instructions. Tr. 791. He opined she has moderate limitations in the ability to carry out very short and simple instructions and marked limitations in the ability to carry out detailed instructions and maintain attention and concentration for extended periods. Tr. 791. He opined she has marked limitations in the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; the ability to sustain an ordinary routine without special supervision; and the ability to work in coordination with or proximity to others without being distracted by them. Tr. 792. He opined she has moderate limitations in the ability to make simple work-related decisions. Tr. 792. He opined she has an extreme limitation in the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Tr. 792. He opined she has a mild limitation in the ability to ask simple questions or request assistance; moderate

---

[8]"Mild" means the ability to function in this area is limited. Tr. 791. "Moderate" means the ability to function in this area is seriously limited. Tr. 791. "Marked" means the ability to function in this area is very seriously limited. Tr. 791. "Extreme" means no useful ability to function in this area. Tr. 791.

limitations in the ability to accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers without distracting them or exhibiting behavioral extremes, and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; and a marked limitation in the ability to interact appropriately with the general public. Tr. 792. On "adaptation," he opined she has a mild limitation in the ability to be aware of normal hazards and take appropriate precautions; a moderate limitation in the ability to respond appropriately to changes in the work setting; and marked limitations in the ability to travel in unfamiliar places or use public transportation, and set realistic goals or make plans independently of others. Tr. 793.

In May 2016, Dr. Restea completed a "Residual Functional Capacity Evaluation." Tr. 1027–29. From a checklist, he opined Asbury could sit and work up to 30 minutes at a time. Tr. 1027. He opined she could sit for 3 to 4 hours a day in an 8-hour workday, 5 days a week, assuming she could take a 5-minute stretch break each hour. Tr. 1027. He opined she could stand for up to 15 minutes at a time and stand for 3 to 4 hours in an 8-hour workday, 5 days a week, assuming she could take a five-minute break to sit or walk each hour. Tr. 1028. He opined she could work at a job with a "sit/stand" option for 3 to 4 hours per day, 5 days a week.[9] Tr. 1028. Asked to describe the clinical data or other objective medical evidence to support the limitations, he wrote, "Extensive chemotherapy for ovarian cancer, known to cause peripheral neuropathy and []10 RSD-like syndrome. Also irreversible [damage or change] to the urine, bladder, rendering patient totally incontinent and unable to pass urine on own. Needs self-catheterizing at all times." Tr. 1029.

The same month, Dr. Restea also completed a "Clinical Assessment of Pain." To the question, "During your course of treatment, has your patient repeatedly

---

[9]Dr. Restea handwrote a short sentence about Asbury's limitations in lifting, but the sentence is illegible. Tr. 1028.

[10]The words between "and" and "RSD-like syndrome" are illegible. Tr. 1029.

reported to you that he or she experiences pain," he answered yes. Tr. 1030. To the question, "From an objective standpoint, based on your experience and the medical literature, would a person with this patient's diagnosis be expected to experience pain," he answered yes. From a checklist, he opined her pain is somatogenic (as opposed to psychogenic), nociceptive, and neuropathic. Tr. 1030–31. He identified her neuropathic pain as "differentiation pain resulting from identifiable peripheral pathology." Tr. 1031. He described her pain as continuous. Tr. 131. To the question, "Does the patient have a complex regional pain syndrome such as reflex sympathetic dystrophy or causalgia," he answered, "Not clear." Tr. 131. To questions asking if she has a chronic pain syndrome and is being medicated for pain, he answered yes and noted she takes opioids and non-opioids. Tr. 131. On medication side effects, he opined she could expect "lethargy … difficulty [in concentration], forgetfulness … coordination problems, loss of strength and endurance."[11] Tr. 1031. To the question asking if she suffers from depression or anxiety related to the pain and is medicated for it, he answered yes. Tr. 1032. To the question, "Subjectively, how much pain is this patient reporting to you," he checked "extreme pain."[12] To the question, "Based on your medical assessment of both the patient's subjective reporting and your objective findings, how would you rate the patient's pain," he answered "7–8" (on a scale of 1 to 10) and checked, "marked pain."[13] He opined she has a moderate limitation in the ability to maintain attention and concentration for extended periods

---

[11]Other side effects Dr. Restea listed are illegible. Tr. 1031.

[12]"Extreme pain" is defined as "8 or more on a pain scale of 1-10" and "is virtually incapacitating so that the patient cannot perform most activities of daily living; and, could not work a normal 8 hours a day 5 days a week (with a 10-15 minute break in the morning and a 10-15 minute break in the afternoon and a 30 minute lunch break)." Tr. 1032.

[13]"Marked pain" is defined as "6 or 7 on a pain scale of 1-10" and "interferes with concentration, persistence and pace and prevents the patient from completing tasks relating to the activities of daily living without frequent (hourly) interruptions for pain relief; and, that assuming an 8 hour work day 5 days a week (with a 10 − 15 minute break in the morning and a 10 − 15 minute break in the afternoon and a 30 minute lunch break) would prevent the patient from completing tasks at work without frequent breaks or interruptions for pain relief." Tr. 1033.

(more than 5 to 10 minutes at a time); marked limitations in the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, and the ability to interact appropriately with the general public; and an extreme limitation in the ability to complete a normal workday and workweek without interruptions from pain and to perform at a consistent pace without an unreasonable number and length of rest periods.[14] Tr. 1034. He opined, "The chronicity of her condition renders [patient] not a good candidate for rehab nor likely to get better." Tr. 1034.

## III.   ALJ's Decision

The ALJ's July 20, 2016, decision concerns only the period at issue—September 1, 2012 (the alleged onset date), to June 30, 2014 (the date last insured).

At step one,[15] the ALJ found Asbury had not engaged in substantial gainful activity. Tr. 15. She observed that Asbury had worked as a caregiver after the onset date and found the work was not substantial gainful activity. Tr. 15.

At step two, the ALJ found Asbury had suffered from severe impairments of disorders of the spine, history of ovarian cancer, and reflex sympathetic dystrophy

---

[14]"Mild" means the "ability to function in this area is limited but not precluded." Tr. 1034. "Moderate" means the "ability to function in this area is seriously limited." Tr. 1034. "Marked" means the "ability to function in this area is very seriously limited." Tr. 1034. "Extreme" means "no useful ability to function in this area." Tr. 1034.

[15]The SSA uses a five-step sequential process to decide if a person is disabled, asking whether (1) she is engaged in substantial gainful activity, (2) she has a severe impairment or combination of impairments, (3) the impairment or combination of impairments meets or equals the severity of anything in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, App'x 1, (4) she can perform any of her past relevant work given her residual functional capacity ("RFC"), and (5) there are a significant number of jobs in the national economy she can perform given her RFC, age, education, and work experience. 20 C.F.R. § 404.1520(a)(4). The claimant has the burden of persuasion through step four. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987).

syndrome. Tr. 15. She found Asbury's urinary retention, pain disorder, anxiety-related disorder, and affective disorder had been non-severe. Tr. 16.

At step three, the ALJ found Asbury had had no impairment or combination of impairments meeting or medically equaling the severity of any impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. Tr. 18. She considered the "paragraph B" criteria and found Asbury had had mild limitations in activities of daily living; mild limitations in social functioning; mild limitations maintaining concentration, persistence, and pace; and had had no episode of decompensation of extended duration.[16] Tr. 17–18. She observed Asbury generally had maintained adequate hygiene, performed light household chores, prepared simple meals, drove, grocery shopped, swam at a friend's pool during the summer, and maintained relationships. Tr. 17. The ALJ observed Asbury had testified about having had some difficulty remembering schedules, names, and paying bills but had exhibited good memory skills at the June 2013 consultative psychological exam and had been able to adequately recite a complicated medical history to healthcare providers. Tr. 17.

After stating she had considered the entire record and summarizing the medical evidence, the ALJ found that Asbury had possessed the residual functional capacity ("RFC") to perform light work[17] with additional limitations:

---

[16]The paragraph B criteria are used to assess functional limitations imposed by medically determinable mental impairments. 20 C.F.R. Part 404, Subpart P, App'x 1 § 12.00(C). Paragraph B requires a disorder of medically documented persistence resulting in at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulty maintaining social functioning; (3) marked difficulty maintaining concentration, persistence, or pace; and (4) repeated episodes of decompensation, each of extended duration. 20 C.F.R. Part 404, Subpart P, App'x 1 § 12.00(C).

[17] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b).

> [Asbury had had] the ability to lift/carry up to 10 pounds frequently and 20 pounds occasionally; sit about six hours in an eight-hour workday; stand and walk about four hours each in an eight-hour workday; with no more than frequent balancing, stooping, kneeling, crouching, and crawling; no more than occasional climbing of ramps/stairs; and no climbing of ladders, ropes, and scaffolds.

Tr. 18. The ALJ stated that the RFC reflected the degree of limitation found in the paragraph B analysis. Tr. 18.

At step four, the ALJ found Asbury had been able to perform her past relevant work[18] as a deputy sheriff and marketing representative. The ALJ specified Asbury had worked as both a patrolwoman and warrant deliverer and "the light job is the one that involves delivering warrants." Tr. 24.

At step five, the ALJ alternatively found Asbury had been able to perform the jobs of ticket seller, storage rental clerk, and routing clerk, and those jobs had existed in significant numbers in the national economy. Tr. 25. In making that finding, the ALJ added further limitations of "performing no more than simple, routine, repetitive tasks with a need for a 10-15 minute break every two hours." Tr. 25. She therefore found no disability. Tr. 26.

## IV.    Standard of Review

A court's review of an ALJ's decision is limited to determining whether the ALJ applied the correct legal standards and whether substantial evidence supports her findings. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005). Substantial evidence is "less than a preponderance"; it is "such relevant evidence as a reasonable

---

[18]"Past relevant work is work [a claimant has] done within the past 15 years, that was substantial gainful activity, and that lasted long enough … to learn to do it." 20 C.F.R. § 404.1560.

person would accept as adequate to support a conclusion." *Id.* The court may not decide facts anew, reweigh evidence, make credibility determinations, or substitute its judgment for the Commissioner's judgment. *Id.* A court must affirm an ALJ's decision if substantial evidence supports it, even if other evidence preponderates against the factual findings. *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).

## V.    Law & Analysis

For disability-insurance benefits, a claimant must prove disability by the date last insured. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).

A claimant's RFC is the most she can still do despite her limitations. 20 C.F.R. § 404.1545(a)(1). The Social Security Administration ("SSA") uses the RFC at step four to decide if the claimant can perform any past relevant work and, if not, at step five with other factors to decide if there are other jobs in significant numbers in the national economy she can perform. 20 C.F.R. § 404.1545(a)(5). The "mere existence" of an impairment does not reveal its effect on a claimant's ability to work or undermine RFC findings. *Moore v. Barnhart*, 405 F.3d 1208, 1213 n.6 (11th Cir. 2005). Though an ALJ need not identify all impairments that should be severe at step two, she must demonstrate she considered all of the claimant's impairments—severe and non-severe—in combination in assessing a claimant's RFC. 20 C.F.R. § 404.1545(a)(2).

## A.    *Severity of Impairments*

Asbury contends substantial evidence does not support the ALJ's findings that her pain disorder, major depressive disorder, PTSD, and anxiety were non-severe. Doc. 18 at 13, 22. Relatedly, she contends the ALJ erred by failing to consider all of her impairments in combination. Doc. 18 at 23.

At step two, an ALJ considers whether a claimant has a severe impairment or combination of impairments. 20 C.F.R. § 404.1520(a)(4)(ii). A severe impairment is

17

an impairment that significantly limits a claimant's ability to do basic work activities. *See* 20 C.F.R. § 404.1521(a) (defining "non-severe impairment"). An impairment must be severe for at least 12 consecutive months. 20 C.F.R. §§ 404.1505(a), 404.1509, 404.1520(a)(4)(ii).

"Step two is a threshold inquiry," *McDaniel v. Bowen,* 800 F.2d 1026, 1031 (11th Cir. 1986), acting as a "filter" to eliminate claims involving no substantial impairment, *Jamison v. Bowen,* 814 F.2d at 585, 588 (11th Cir. 1987). "[T]he finding of any severe impairment ... whether or not it results from a single severe impairment or a combination of impairments that together qualify as severe" satisfies step two. *Id.*

> On Asbury's urinary retention impairment, the ALJ explained,

> The medical record documents diagnosis of urinary retention treated with self-catheterization four times daily without difficulty. Despite an exhaustive evaluation, the claimant's treating urologist, Dr. Gaddy, stated that the etiology of the claimant's urinary retention was unclear. June 28, 2012 testing found normal cystoscopy examination with minor cystitis. There is no objective evidence showing that the condition had more than a minimal effect on the claimant's functional abilities through the date last insured and, therefore, is found to be nonsevere.

Tr. 16.

> In explaining the evidence supporting the RFC, the ALJ further explained,

> Medical treatment records from June 26, 2014, noted to be just four days prior to the claimant's date last insured, do not reflect complaints of incontinence or problems associated with self-catheterization. The claimant self catheterized four times/day, and only at night. As previously discussed, urology records indicate the claimant had no difficulty self-catheterizing. Thus, there is no indication how the claimant's need to self-catheterize would result in the limitations identified by Dr. Restea.

Tr. 23.

18

On Asbury's pain disorder and mental illnesses, the ALJ stated,

Pain disorder was diagnosed following a mental health evaluation in April 2013. There is no evidence that mental health treatment was required for the diagnosis of pain disorder. Major depressive disorder and posttraumatic stress disorder (PTSD) were diagnosed following a June 2013 mental health evaluation. The medical record documents a history of intermittent psychotropic medication use for reported depression and anxiety. When the evidence of record was reviewed by the State agency psychological consultant in September 2013, it was noted that the results of the June 2013 evaluation revealed no obvious indications of a severe mood/behavior disturbance, acute/residual psychosis, or significant neuropsychological impairment. While some increased anxiety was noted in early 2014 related to situational stressors, the claimant's pain management provider prescribed anxiolytic medication for the claimant's anxiety state. There is no evidence of further evaluation/treatment by a mental health specialist. Thus, the subsequent medical evidence does not establish additional limitations through the date last insured. More recent medical records, from December 2015, indicate the claimant presented for treatment with a normal appearance, and was described as alert and oriented, with normal recent and remote memory, and normal attention and concentration.

…

The State agency assessed the claimant's mental abilities and limitations on September 3, 2013, and determined that the claimant's mental impairment was not severe. Likewise, based on the lack of any regular or consistent formal mental health treatment, and the observations of the claimant's treating physicians who reported no signs or symptoms consistent with a severe mental impairment, I also find the claimant's mental impairment was not severe through the date last insured. Accordingly, significant weight is given to the State agency psychological consultant's opinion.

Tr. 16.

The ALJ explained why she found some impairments non-severe, and substantial evidence supports the findings. (Evidence of mental impairments is discussed in more detail below.) Even if the ALJ erred in finding those impairments non-severe, the error is harmless because the ALJ found Asbury has severe

19

impairments, prompting the ALJ to move to step three, *see Jamison*, 814 F.2d at 588, and consider all impairments in combination, as evidenced by inclusion of mental limitations (limited to simple, routine tasks) in the hypothetical to the vocational expert, discussion of the urinary retention issue in the RFC analysis, discussion of how evidence did not support Dr. Restea's limitations, and the inclusion of several physical limitations in the RFC.

**B.    *Doctors' Opinions*[19]**

Regardless of its source, the SSA "will evaluate every medical opinion" it receives. 20 C.F.R. § 404.1527(c). Opinions on issues that are dispositive of a case, such as whether a claimant is disabled, are not medical opinions because they are opinions on issues reserved to the Commissioner. 20 C.F.R. § 404.1527(d)(1).

An ALJ "must state with particularity the weight given to different medical opinions and the reasons therefor." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011). Within the classification of acceptable medical sources are the following sources that are entitled to different weights of opinion: (1) a treating source, which is "your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you"; (2) a non-treating source, which is "a physician, psychologist, or other acceptable medical source who has examined you but does not have, or did not have, an ongoing treatment relationship with you"; and (3) a non-examining source, which is "a physician, psychologist, or other acceptable medical source who has not examined you but

---

[19]The Commissioner substantially revised regulations on the consideration of medical evidence for claims filed on or after March 27, 2017. *See* 82 Fed. Reg. 5844-01, 5844 (Jan. 18, 2017). Asbury filed her claim before that date. All citations are to the regulations in effect on the date Asbury filed her claims.

provides a medical or other opinion in your case ... includ[ing] State agency medical and psychological consultants[.]" 20 C.F.R. § 404.1502.

The regulations and case law indicate a general preference for treating sources' opinions over those of non-treating sources, and those of non-treating sources over those of non-examining sources. *See* 20 C.F.R. § 404.1527(c)(2); *Ryan v. Heckler*, 762 F.2d 939, 942 (11th Cir. 1985). But an ALJ need not give more weight to a treating source's opinion if there is good cause to do otherwise and substantial evidence supports the good cause. *Phillips v. Barnhart*, 357 F.3d 1232, 1240 (11th Cir. 2004). Good cause exists if the evidence does not bolster the opinion, the evidence supports a contrary finding, or the opinion is conclusory or inconsistent with the treating source's own medical records. *Id.* at 1240−41. The Eleventh Circuit has emphasized, "The law is clear that, although the opinion of an examining physician is generally entitled to more weight than the opinion of a non-examining physician, the ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion." *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985).

Unless the SSA gives a treating source's opinion controlling weight, it will consider several factors to decide the weight to give a medical opinion: examining relationship, treatment relationship, supportability, consistency, specialization, and any other relevant factor. 20 C.F.R. § 404.1527(c). An ALJ need not explicitly address each factor. *Lawton v. Comm'r of Soc. Sec.*, 431 F. App'x 830, 833 (11th Cir. 2011). The SSA "generally give[s] more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty than to the medical opinion of a source who is not a specialist." 20 C.F.R. § 404.1527(c)(5).

State-agency medical and psychological consultants are highly qualified and "also experts in Social Security disability evaluation," 20 C.F.R. § 404.1527(e)(2)(i), and their opinions may be entitled to great weight if the evidence in the record

supports them, Social Security Ruling ("SSR") 96-6p, 61 Fed. Reg. 34466, 34467–68 (July 2, 1996).[20]

"[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009). If "remand would be an idle and useless formality," a reviewing court is not required to "convert judicial review of agency action into a ping-pong game." *N.L.R.B. v. Wyman-Gordon Co.*, 394 U.S. 759, 766 n.6 (1969). An erroneous factual statement by an ALJ may be harmless if the ALJ applies the proper legal standard. *Diorio v. Heckler*, 721 F.2d 726, 728 (11th Cir. 1983); *Majkut v. Comm'r of Soc. Sec.*, 394 F. App'x 660, 665 (11th Cir. 2010).

If an ALJ finds a claimant has moderate difficulties in concentration, persistence, or pace, she must implicitly or explicitly account for any related limitation in her hypothetical question to the vocational expert or find the claimant's ability to work is unaffected by the difficulties. *Winschel*, 631 F.3d at 1181. Failure to do so renders the hypothetical question to the vocational expert incomplete and precludes reliance on the expert's testimony as substantial evidence supporting finding the claimant able to work. *Id.* "[R]estricting the claimant to simple and routine tasks adequately accounts for restrictions related to concentration, persistence, and pace where the medical evidence demonstrates that the claimant retains the ability to perform the tasks despite limitations in concentration, persistence, and pace." *Timmons v. Comm'r of Soc. Sec.*, 522 F. App'x 897, 907 (11th Cir. 2013) (citing *Winschel*, 631 F.3d at 1180).

---

[20]SSRs are agency rulings published under the Commissioner's authority and binding on all components of the Social Security Administration. *Sullivan v. Zebley*, 493 U.S. 521, 531 n.9 (1990). They are not binding on a court but may be entitled to great respect and deference. *B.B. v. Schweiker*, 643 F.2d 1069, 1071 (5th Cir. Unit B. 1981); *see Stein v. Reynolds Sec. Inc.*, 667 F.2d 33, 34 (11th Cir. 1982) (Eleventh Circuit is bound by decisions issued by Unit B panels of the former Fifth Circuit).

1.    *Dr. Restea*

Asbury makes several related arguments. She contends the ALJ violated the "treating physician rule" because substantial evidence does not support the ALJ's reasons for failing to give Dr. Restea's opinions controlling weight and the ALJ did not properly consider the factors for a treating physician, Doc. 18 at 13, 17, 20; the ALJ made a factual error by finding Dr. Restea's treatment began in June 2014 when it actually began in January 2013, Doc. 18 at 19 (citing Tr. 386); and the ALJ "cherry-picked" quotes—particularly from Dr. Guskiewicz—to support the RFC assessment and notes that Yue Wang, M.D., Ph.D, prescribed gabapentin and nortriptyline (which she states are for neuropathic pain) and Dr. Guskiewicz assessed "chronic pain," which she states is neuropathic pain, Doc. 18 at 18.

The ALJ gave "no significant weight" to Dr. Restea's opinions:

Dr. Restea submitted multiple reports indicating that the claimant had limitations that would preclude the ability to sustain work activity. Although Dr. Restea is a treating source, it is noted that his treatment began in June 2014, the last month of the claimant's insured status. The claimant testified that she was referred to Dr. Restea for complications with high blood pressure, but this is not consistent with the presenting chief complaints of history of ovarian cancer and 60 pound weight loss in four months documented on the initial office visit note. A review of the medical evidence fails to corroborate such weight loss, as the claimant's weight was recorded as 144 pounds on January 8, 2014[,] and 146 pounds at the initial office visit with Dr. Restea on June 9, 2014.

…

I give no significant weight to Dr. Restea's assessed limitations as he reportedly based them on peripheral neuropathy secondary to a history of chemotherapy, "RSD-like syndrome," the claimant's need to self catheterize, and the claimant's subjective complaints, which are far in excess of clinical abnormalities and objective medical findings. The report of peripheral neuropathy is inconsistent with the treatment notes from Dr. Bailey, a neurosurgeon, who indicated that electrodiagnostic testing was needed to further evaluate the claimant's subjective complaints of lower extremity symptoms. Dr. Wang, a Board Certified

Neurologist [who Asbury began seeing at the end of 2015, after the date last insured, Tr. 1035–77], did not diagnose neuropathy, and Dr. Guskiewicz concluded that the claimant's neurologic exam findings were normal. It is not clear what testing, if any, was done by Dr. Restea in reaching the peripheral neuropathy diagnosis. Furthermore, the most recent documented neurological examination findings were essentially normal.

…

Dr. Restea's report of "RSD-like syndrome" does not clearly meet the definition of a medically determinable impairment and the assessed limitations are not well-supported by symptoms and clinical findings documented in the treatment records. Overall, Dr. Restea did not explain how those diagnoses translate into the assessed limitations. It is noted that the State agency medical consultant's opinion, which I give considerable weight, considered pain limitations in the residual functional capacity assessment even though examination findings were within normal limits.

…

Medical treatment records from June 26, 2014, noted to be just four days prior to the claimant's date last insured, do not reflect complaints of incontinence or problems associated with self-catheterization. The claimant self catheterized four times/day, and only at night. As previously discussed, urology records indicate the claimant had no difficulty self-catheterizing. Thus, there is no indication how the claimant's need to self-catheterize would result in the limitations identified by Dr. Restea.

Tr. 22–23 (internal citations omitted).[21]

The ALJ also discussed the weight given to the state-agency doctors:

[O]n September 7, 2013, a State agency medical consultant reviewed the evidence of record and determined the claimant was capable of a range

---

[21] The ALJ also discussed the weight given to a "Third Party Function Report" from Asbury's husband. Tr. 23. Asbury does not challenge the ALJ's findings on this evidence and does not cite the function report in arguments against the ALJ's findings. *See generally* Doc. 18.

of light exertional work activity. This finding is not inconsistent with the claimant's history of treatment during the relevant period, adequate response to treatment, only mild to moderate abnormalities demonstrated on musculoskeletal imaging studies, and clinical observations and results of physical examinations that failed to identify more substantial functional limitations. … Although the consultant did not have the opportunity to examine the claimant, the findings are consistent with the record as a whole, and have been given considerable weight. The subsequent medical evidence does not establish additional impairments or any significant change in symptoms during the period at issue.

Tr. 22.

The ALJ provided good cause to reject Dr. Restea's opinion, and substantial evidence supports that good cause. While Dr. Restea opined Asbury had an "RSD-like syndrome," Tr. 1029, to the question, "Does the patient have a complex regional pain syndrome such as reflex sympathetic dystrophy or causalgia," he answered, "Not clear," Tr. 131. The ALJ did not "cherry-pick" quotes from other doctors; she provided a thorough recitation of the medical evidence in which no other doctor diagnosed complex regional pain syndrome or reflex sympathetic dystrophy syndrome. Dr. Guskiewicz prescribed medication to alleviate symptoms and stated neurological exam findings were normal. Tr. 419. No doctor equates "chronic pain" with neuropathic pain. While Asbury presented with pain and some abnormalities of the lumbar spine, most exams showed normal neurological findings with appropriate motor strength and movement. "Neuropathy" was only "assessed" once by an emergency-care provider when Asbury complained of bilateral lower leg pain and running out of medication the day before, and she was prescribed hydrocodone and told to follow up with a pain specialist. Tr. 514, 520. Moreover, any error in assessing the wrong start date for treatment with Dr. Restea is harmless because there was a long gap in treatment (the first visit in January 2013 was for emergency treatment at the clinic), and the ALJ still considered him a treating physician. Contrary to Asbury's suggestion, the ALJ considered the supportability of the opinion and

consistency of the opinion with the record as a whole and was not required to explicitly address each factor in the regulation. *See Lawton*, 431 F. App'x at 833.

2.    *Dr. Beaty*

Asbury contends the ALJ failed to give proper weight to Dr. Beaty's report and ignored the GAF rating he assigned. Doc. 18 at 15–17. Relatedly, she contends the ALJ failed to make specific findings on the mental demands of her past relevant work. Doc. 18 at 14.

The ALJ gave "no significant weight" to Dr. Beaty's GAF rating and January 2016 opinion:

> No significant weight is given to the assessed GAF rating of 40, indicating major impairment in functioning, provided by Dr. Beaty following the one-time June 2013 consultative psychological evaluation. This degree of impairment is not consistent with the claimant's very limited history of mental health treatment, or the mental status exam findings reported by Dr. Beaty in the associated report. While the claimant reportedly presented as depressed and anxious with a sad, constricted, and flat affect, she was oriented and demonstrated normal speech, intact and organized thought processes without exhibited delusions or paranoia, and high average cognitive cooperative, and responsive to questions with spontaneous elaborated answers. Dr. Beaty completed a Medical Source Statement in January 2016, reporting limitations as of June 2013, however, there is no evidence that Dr. Beaty had contact with the claimant in the interim and, as noted above, the reported degree of limitation is not consistent with the clinical findings reported in June 2013. As such, no significant weight is given to Dr. Beaty's January 2016 opinion.

Tr. 17 (internal citations omitted).

Substantial evidence supports the ALJ's decision to give little weight to Dr. Beaty's report and the GAF rating. As the ALJ explained, Dr. Beaty based his report on a one-time evaluation of Asbury from two-and-a-half years earlier and did not see her in the interim. Tr. 17. The state-agency doctor who later evaluated the medical evidence reported "no obvious indications of a severe mood/behavioral disturbance,

acute/residual psychosis, or significant neuropsychological impairment[,] making the assigned GAF score of 40 [from Dr. Beaty] highly suspect," and determined that any mental impairment was non-severe. Tr. 111. Medical reports would often list depression or anxiety in past medical history, but it is unclear from where the diagnoses came, s*ee, e.g.*, Tr. 434, or depression or anxiety would be listed next to "review of systems" by a physician's assistant not practicing in mental-health treatment, *see, e.g.,* Tr. 373. Other reports indicated Asbury was "negative" for depression and anxiety, Tr. 388; her affect and psychiatric findings were normal, Tr. 419; she denied having depression, Tr. 423; she had no anxiety and no depression, Tr. 686; or she had "anxiety states" and was prescribed Xanax by her pain management doctor (Dr. Guskiewicz), Tr. 668. Additionally, Dr. Beaty's report was primarily based on Asbury's self-reported physical symptoms, outside of his area of expertise. The ALJ did not ignore the GAF rating assigned by Dr. Beaty but correctly stated the law on considering it and explained why she gave it little weight, including Dr. Beaty's limited (one-time) contact with Asbury and the inconsistency with other medical evidence. Tr. 17.

Even if the ALJ erred in failing to make mental findings about Asbury's past relevant work, any error is harmless because the ALJ found at step five that Asbury could perform other jobs with limitations that include "performing no more than simple, routine, repetitive tasks," Tr. 25, which accounts for limitations in concentration, persistence, and pace. See *Timmons,* 522 F. App'x at 907.

### C. SSR 03-2P, Reflex Sympathetic Dystrophy Syndrome

Asbury contends the ALJ failed to comply with SSR 03-2P in evaluating the severity of reflex sympathetic dystrophy syndrome. Doc. 18 at 14.

SSR 03-2P describes how reflex sympathetic dystrophy syndrome (also known as complex regional pain syndrome) should be evaluated. 2003 WL 22399117 (Oct. 20, 2003); see also POMS DI 24580.025 ("Evaluation of Reflex Sympathetic Dystrophy Syndrome/Complex Regional Pain Syndrome"). It identifies the syndrome as a pain syndrome often resulting from trauma to a single extremity or disease, surgery, or injury. SSR 03-2P, 2003 WL 2239917 at *1. It presents as "persistent, burning, aching or searing pain that is initially localized to the site of the injury [and] … the degree of reported pain is often out of proportion to the severity of the precipitating injury." Id. at *2. The signs and symptoms are "strongly implicated" by "dysfunction of the sympathetic nervous system." Id. at *1. A diagnosis requires complaints of persistent, intense pain impairing the mobility of the affected area and associated with swelling, autonomic instability (changes in skin color or texture, sweating, skin temperature, or goosebumps), abnormal hair or nail growth, osteoporosis, or involuntary movements of the affected region of the initial injury. Id. at *2. The most important treatments are "to increase limb mobility and promote use of the extremity … during activities of daily living." Id. at *3. The syndrome may be the basis for a disability finding, but "[d]isability may not be established on the basis of an individual's statement of symptoms alone." Id. at *4.

On reflex sympathetic dystrophy syndrome, the ALJ stated,

> In May 2016, Dr. Restea, a primary care provider, assessed that the claimant had significant limitations as a result of an "RSD-like syndrome." Treatment records do not reflect a diagnosis of RSD or document the precipitant factors noted in SSR 03-02p. Nevertheless, in order to resolve doubts in the claimant's favor, I included this condition as a medically determinable severe impairment.

Tr. 16.

The ALJ did not fail to comply with SSR 03-2P. The ALJ included the syndrome as a severe impairment even though Asbury did not list it on her application, Tr. 270, 274, did not have factors in the SSR for a diagnosis (complaints of persistent associated with swelling, autonomic instability, abnormal hair or nail growth, osteoporosis, or involuntary movements of the affected region of the initial injury), and Dr. Restea listed only "RSD-like syndrome" with no specific diagnosis, Tr. 1029. The ALJ included physical limitations in the RFC to account for Asbury's limitations.

## D.   *Credibility*

Asbury contends substantial evidence does not support the ALJ's credibility findings. She contends medical evidence supports her hearing testimony, pointing to records post-dating the date last insured where she complained of headaches, Doc. 18 at 20–21, and other medical evidence describing chronic pain, Doc. 18 at 21.

In evaluating a claimant's subjective complaints of pain or other symptoms, an ALJ must determine if there is an underlying medical condition and either (1) objective medical evidence confirming the severity of the alleged symptom arising from that condition or (2) evidence the condition is so severe that it can be reasonably expected to cause the alleged symptom. *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). An ALJ must consider "whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [the claimant's] statements and the rest of the evidence." 20 C.F.R. § 404.1529(c)(4). If an ALJ discredits a claimant's testimony about the intensity, persistence, and limiting effects of a symptom, he must provide "explicit and adequate reasons for doing so." *Holt*, 921 F.2d at 1223. "A clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court." *Foote v. Chater*, 67 F.3d 1553, 1562 (11th Cir. 1995). A reviewing court should ask not whether the ALJ could have reasonably credited a claimant's testimony, but whether he had been

"clearly wrong" to discredit it. *Werner v. Comm'r of Soc. Sec.*, 421 F. App'x 935, 939 (11th Cir. 2011).[22]

> On Asbury's credibility, the ALJ stated,

> Although the claimant had subjective complaints of aches and pains of the musculoskeletal system, objective testing revealed only mild to moderate abnormalities, and physical examinations and observations did not reveal significant functional limitations beyond those allowed for in the [RFC]. The claimant generally had a normal gait, functional range of motion of all joints, normal strength, no evidence of muscle wasting, and no annotation of significant motor, sensory, or reflex deficits. If one compares the findings on the objective diagnostic imaging studies, as well as the result of the many physical examinations documented throughout the record, it appears that the complaints of debilitating pain were out of proportion to the overall objective medical findings.

Tr. 21.

> On the medical evidence (including evidence after the date last insured), the ALJ stated,

> [T]reatment was essentially routine and conservative in nature during the relevant period, and generally successful in managing the claimant's symptoms. While some changes and/or adjustments were made to prescribed medications over the course of treatment to optimize symptom control, no substantial changes were made to the treatment regimen, suggesting that the treating doctors felt symptom control was adequate.

> …

---

[22]Effective March 28, 2016, SSR 16-3p rescinded a previous SSR regarding credibility of a claimant. SSR 16-3p, 2017 WL 5180304 (October 25, 2017) (republished). It removed "credibility" from policy because the regulations do not use that term. SSR 16-3p. It clarified that "subjective symptom evaluation is not an examination of an individual's character," and provided a two-step evaluation process. *Id.* SSR 16-3p applies only prospectively. *Hargress v. Soc. Sec. Admin.*, 883 F.3d 1302, 1308 (11th Cir. 2018). The previous SSR applies here.

> [E]ven if the claimant's daily activities are as limited as alleged, the record does not document that a physician imposed such restrictions, and it is therefore difficult to attribute that degree of limitation to the claimant's medical condition. The claimant's activity level is viewed as a choice of lifestyle as opposed to being medically necessary based on the objective medical evidence contained in the record. Furthermore, such a degree of restriction cannot reasonably be attributed to the claimant's medical condition, as it is not supported by the claimant's treatment records or course of treatment pursued by her doctors.

Tr. 21–22.

Finally, the ALJ concluded,

> Although [Asbury's] short lived work activity [after the alleged onset date] did not constitute disqualifying substantial gainful activity, it does indicate that the claimant's capacities and abilities were, at least at times, somewhat greater than the claimant generally reported.

Tr. 22.

Substantial evidence supports the ALJ's credibility findings. The ALJ thoroughly explained the medical evidence, conservative treatment, lack of evidence supporting the alleged pain and symptoms before the date last insured, and cited, for example, Asbury's repeated misstatements of weight loss to doctors (e.g. stating she had lost 30 pounds in 2 months, Tr. 384, when the documented weight loss was about 12 pounds, *compare* Tr. 373 *with* Tr. 366). Tr. 19–23. The ALJ was not clearly wrong in discrediting Asbury's testimony to the extent she claimed limitations greater than those in the RFC.

## VI.   Conclusion

Asbury's brief includes complaints about perceived systemic flaws and failures in the administrative review of disability claims and asks the Court to conduct its review against that background. *See* Doc. 18 at 2–5. Regardless of any general flaws or failures, there is no basis for reversal in this case.

31

## VII.   Recommendations

Because the ALJ applied the correct legal standards and substantial evidence supports her decision, I recommend:

**(1)**      affirming the Commissioner's decision;

**(2)**      denying the request for oral argument;

**(3)**      directing the Clerk of Court to enter judgment in favor of Nancy A. Berryhill and against Debbie Lynn Asbury affirming the Commissioner's decision under sentence four of 42 U.S.C. § 405(g); and

**(4)**      directing the Clerk of Court to close the file.[23]

**Entered** in Jacksonville, Florida, on July 18, 2018.

_____

PATRICIA D. BARKSDALE
*United States Magistrate Judge*

c:      The Honorable Timothy J. Corrigan
Counsel of Record

---

[23]"Within 14 days after being served with a copy of [a report and recommendation on a dispositive motion], a party may serve and file specific written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b)(2). "A party may respond to another party's objections within 14 days after being served with a copy." *Id.* A party's failure to serve and file specific objections to the proposed findings and recommendations alters the scope of review by the District Judge and the United States Court of Appeals for the Eleventh Circuit, including waiver of the right to challenge anything to which no specific objection was made. *See* Fed. R. Civ. P. 72(b)(3); 28 U.S.C. § 636(b)(1)(B); 11th Cir. R. 3-1; Local Rule 6.02.